**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

COREY SHIROD SMITH,      )
                                )
      Petitioner,         )
                                )
  v.                        )     3:13-cv-437-RAH
                                )        (WO)
JOHN Q. HAMM[1],      )
                                )
      Respondent.    )
                                )

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner Corey Shirod Smith (hereinafter "Smith"), an inmate in the custody of the Alabama Department of Corrections, filed this habeas corpus petition, pursuant to 28 U.S.C. § 2254, challenging the death sentence he received following his conviction for capital murder in the Circuit Court of Tallapoosa County in September 1995.[2] Smith claims that his death sentence was obtained in violation of his rights under the United States Constitution. Smith does not challenge his capital murder conviction. He claims that he received ineffective assistance of counsel in

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), John Q. Hamm, the present Commissioner of the Alabama Department of Corrections, is automatically substituted in his official capacity as a party to this action, replacing the former Commissioner.

[2] When filed, this case was originally assigned to District Judge Mark E. Fuller. (Doc. 1.) On August 21, 2014, this case was reassigned to then-Chief District Judge W. Keith Watkins (Doc. 28), and on December 17, 2019, this case was reassigned to the undersigned, (Doc. 32).

violation of his Sixth Amendment rights at the penalty phase of his trial, resulting in a death sentence.

## I.     BACKGROUND

### A.     The Arrest, Confession, and Initial Proceedings

On February 26, 1995, Smith was arrested on a criminal complaint charging him with the capital murder of Kimberly Brooks, Smith's former girlfriend.[3] (Doc. 15-1 at 7-8.)  While detained in the Tallapoosa County Jail, Smith confessed in a detailed, handwritten statement to the police that he had killed Brooks.  In this confession, Smith explained the series of events culminating in her murder as follows:

> Kim came to the house around 7:30 a.m. Wednesday morning with Labreasha Main. We was talking about getting married later on. My brother Reginald came and Main left. After awhile, Reginald left.
>
> When my mamma got off work, me and Kim got into an argument about another girl calling me. We went outside. I pulled my gun on her. Sanjay [Brooks] and Shontai [Smith] pulled up. I forced her into the van. I told Sanjay to go to Bibb Town, which he did. And, when we got there, Kim and I got out, continuing arguing.
>
> I told her I love her, and if I couldn't have her, no one could. She told me she loved me but things weren't the same. I kissed her on the forehead and pushed her off me and shot her in

---

[3] References to page numbers are to those generated by the Court's electronic CM/ECF filing system.

the chest. And then she fell to the ground, and I shot her again toward her head.

Shontai got out and helped me drag her into the bushes. We left. Sanjay dropped us off into the soft sands. When he returned, we got James Shealey['s] car and got some gas and went back where I left her. When we got there, she was standing up, and she got in the car and sat beside me. I was scared.

Sanjay rode from Bibb Town to Reeltown looking for a place to set her on fire and bury her. I asked her what would she say if I took her to the hospital. She sa[id], "I'm going to say Corey shot me." We returned back to Bibb Town, and Sanjay drop us off—dropped us off. He told us to go ahead and finish her and he'll be back.

We put a trash bag over her face until she died. I poured the gas on her, and Shontai lit the lighter. Sanjay never returned.

We left there and walked back to my house. Shontai spent the night. The next [day] he left and I never saw him again.

*Smith v. State*, 122 So. 3d 224, 226 (Ala. Crim. App. 2011) (quoting *Smith v. State*, 797 So. 2d 503, 509 (Ala. Crim. App. 2000) (cleaned up).

Following a preliminary hearing, on May 12, 1995, Smith, Sanjay Brooks, and Shontai Smith were charged in a two-count indictment with the murder of Kimberly Brooks during the course of a kidnapping in violation of Alabama Code § 13A-5-40(a)(1) (1975). (Doc. 15-1 at 9-10.)[4]  The co-defendants pleaded guilty to

---

[4]  The two counts in the indictment charged variations of Kidnapping in the First Degree as the basis for the capital offenses.  During the trial, on the State's motion, the trial court dismissed one count of the indictment.  (*See* Doc. 15-52 at 2.)

murder and kidnapping and received life sentences.[5]  During the guilt phase of trial, both co-defendants testified for the prosecution and corroborated statements contained in Smith's confession.  *Smith*, 797 So. 2d at 510.

## B.   Guilt Phase of Trial

Jury selection began August 28, 1995, and the trial began on August 30, 1995.

### 1.  Prosecution's Evidence

For its case-in-chief, the prosecution presented evidence from:  (1) Stacy Brown, a friend of the victim; (2) Emily Williams, a friend of the victim; (3) Toney Brown, the victim's boyfriend at the time of her death; (4) Carl Stewart, Assistant Principal at Tallassee High School; (5) Sanford McQueen, the victim's neighbor; (6) Emma Forte, Smith's mother; (7) Larry Butler, Smith's cousin; (8) James Bo Shealey; (9) Sanjay Brooks; (10) Shontai Smith; (11) Lakecia Corbitt; (12) Mattie Brooks, the victim's mother; (13) Wilbur Terrell, Deputy Sheriff, Tallapoosa County; (14) Richard Lucas, Deputy Sheriff, Tallapoosa County; (15)  Lamar Powell, Deputy Sheriff, Tallapoosa County; (16) Gloria Waters, latent fingerprint expert; (17) Tellis Hudson, forensic scientist; (18) Bill Landrum, forensic serologist; (19) Mary Holt, forensic scientist; (20) Katherine McGheehan, forensic scientist in biology; (21) Jim Sparrow, forensic investigator; (22)  Jim Lauridson, forensic

---

[5]  Sanjay Brooks received concurrent life sentences on each count; Shontai Smith received two consecutive life sentences.  *Smith*, 797 So. 2d at 510.

4

pathologist; (23) Joe Saloom, firearms expert; and (24) William J. Hough, III, investigator, Tallapoosa County Sheriff's Department.

### 2.    Defendant's evidence

Smith did not testify at trial or present any evidence in his defense.

### 3.    The Verdict

On September 1, 1995, the jury returned a verdict finding Smith guilty of capital murder.  (Doc. 15-19 at 37-38.)

## C.    Penalty Phase of Trial

The trial court proceeded with the penalty phase of Smith's trial on September 2, 1995.

### 1.  The Evidence

Smith presented evidence from (1) Reginald Smith, his older brother; (2) Annie Butler, his aunt; (3) Marrell Hayes, his cousin; (4) Larry Butler, Sr., his uncle by marriage to Annie Butler; (5) Herbert J. Woodruff, store manager, Wal-Mart; (6) Arlene Hooks, Smith's brother's girlfriend; (7) Katrina Smith, Smith's half-sister; (8) Chowon Smith, Smith's half-brother; (9) Latrice Smith, Smith's half-sister; (10) Jelma Smith, Smith's step-mother; (11) James Coan, Smith's Youth Baseball coach; (12) Rebecca Taunton, Smith's teacher at Reeltown High School; (13) Latasha Butler, Smith's cousin; (14) Jerry Terrell, his uncle by marriage; (15) Casbie Forte, his step-father; and (16) Emma Forte, his mother.  In rebuttal, the prosecution called

Mattie Brooks to testify.  Ms. Brooks is Kimberly Brooks's mother and the grandmother of Labreshea, the infant daughter of Kimberly Brooks, the victim, and Smith.  (Doc. 15-20 at 66-68.)

### 2.  The verdict

On September 2, 1995, the trial court instructed the jury on aggravating and mitigating circumstances.  The jury voted 12-0 in favor of a death sentence.  (Doc. 15-20 at 122, 124-32.)

### 3.  Sentencing hearing

The trial court conducted a sentencing hearing on September 14, 1995.  For the reasons stated in the Sentencing Order, consistent with the jury's recommendation, the trial court sentenced Smith to death.  (Doc. 15-52 at 2-20.)

## D.    Direct Appeal

Smith, represented by his trial counsel, Lee Sims and Palmer Singleton, appealed his conviction and death sentence to the Alabama Court of Criminal Appeals ("ACCA").   On appeal, Smith asserted numerous claims challenging the guilt and penalty phases of trial.[6]  On August 25, 2000, the ACCA affirmed Smith's

---

[6] On direct appeal before the ACCA, Smith claimed that, during the guilt phase, the trial court (1) erred in not quashing the indictment because there was gender discrimination in the selection of the grand jury foreperson; (2) erred in denying his motion to dismiss the indictment because it was vague, duplicitous, multiplicitous, and improperly drawn under Alabama Code § 15-8-50 (1975); (3) denied him a fair and impartial trial by rulings made during voir dire examination; (4) erred in denying his motion for a continuance; (5) erred in denying his motion to suppress a statement he made to police (a) after being subjected to a truth verification/voice stress analysis machine, (b) after being held in custody for eight hours, and (c) after the police failed to re-administer his *Miranda* rights; (6) committed reversible error by interrogating one of the State's witnesses and Smith's co-defendant, Sanjay Brooks; (7) erred in allowing

conviction and death sentence.  *Smith v. State*, 797 So. 2d 503 (Ala. Crim. App.

2000), *rehrg. den.*, October 20, 2000.  The Alabama Supreme Court denied Smith's

petition for a writ of certiorari the following year.  *Ex parte Smith*, 797 So. 2d 549

(Ala. 2001).  The United States Supreme Court also denied Smith's petition for a

writ of certiorari.  *Smith v. Alabama*, 534 U.S. 962 (2001).

## E.    State Post-Conviction Proceedings

### 1.  Procedural History

On June 7, 2002, Smith, represented by new counsel, Jerry Kristal and

Stephen R. Glassroth, filed a state post-conviction petition pursuant to Rule 32 of

the Alabama Rules of Criminal Procedure ("Rule 32 Petition") in the Circuit Court

of Tallapoosa County.[7] (Doc. 15-34 at 40-86.)  On September 19, 2002, Smith filed

the First Amended Rule 32 Petition.  (*Id.* at 131-82.)

On April 1, 2005, the Rule 32 court set Smith's Rule 32 Petition, as amended,

for a final hearing on July 25, 2005.  (Doc. 15-35 at 67.)  On July 18, 2005, one week

before this hearing, Smith filed a Second Amended Rule 32 Petition.  (*Id.* at 147-95;

---

the admission of a prior consistent out-of-court statement by Shontai Smith; (8) erred in allowing evidence
of what, he alleged, were vague threats Smith had made to the victim; (9) erred in admitting photographs
of the autopsy, which denied him a fair trial; and (10) erred in allowing evidence of the public disturbance
outside the victim's residence, which Smith alleged was not admissible at the guilt phase of the trial.  Smith
also claimed during the penalty phase that (1) the trial court erred in excluding evidence that related to
mitigating circumstances surrounding Smith's childhood; (2) the trial court erred by interrupting his closing
argument in the penalty phase; and (3) the prosecutor committed reversible error on four separate occasions
during closing argument.

[7] When discussing the state post-conviction proceedings, this Court will refer to the Tallapoosa Circuit
Court as "the Rule 32 court."

Doc. 15-36 at 4-71.)  The State objected to the filing of Smith's Second Amended Rule 32 Petition on the grounds of undue delay by Smith and undue prejudice to the State; the State moved to strike the filing.  (*Id.* at 72-75.)  After oral argument on the matter, the Rule 32 court granted the State's motion to strike Smith's Second Amended Rule 32 Petition.  (Doc. 15-37 at 114.)

On July 25-26, 2005, the Rule 32 court held an evidentiary hearing on Smith's First Amended Rule 32 Petition.  (Doc. 15-37 at 106-205; Doc. 15-38 at 3-202; Doc. 15-39 at 3-95.)  On March 3, 2006, the Rule 32 court denied Smith's First Amended Rule 32 Petition.  On appeal, the ACCA held that the Rule 32 court abused its discretion in striking Smith's Second Amended Rule 32 Petition, reversing the court's decision and remanding for a hearing on the second state post-conviction petition.  *Smith v. State*, 961 So. 2d 916 (Ala. Crim. App. 2006).

On December 10, 2007, the Rule 32 court conducted an evidentiary hearing on Smith's Second Amended Rule 32 Petition.  (Doc. 15-46 at 135-204; Doc. 15-47 at 3-202; Doc. 15-48 at 3-71.)  On December 11, 2008, the Rule 32 court denied Smith's Second Amended Rule 32 Petition.  (Doc. 15-46 at 5-134; Doc. 15-52 at 99-228.)  On September 30, 2011, the ACCA affirmed the denial of Smith's Second Amended Rule 32 Petition.[8]  *Smith v. State*, 122 So. 3d 224 (Ala. Crim. App. 2011),

---

[8]  On appeal of the denial of the Second Amended Rule 32 Petition, Smith raised similar claims of ineffective assistance of counsel, including claims challenging counsels' failure to investigate or present mitigating mental health evidence and failure to object to the "Especially Heinous, Atrocious or Cruel" aggravated circumstance. *Smith v. State of Alabama*, No. CR-08-0638, WL 5256959 (Ala.Crim.App. April 1, 2009).

*rehrg. den.*, December 9, 2011. (*Id.*) On February 22, 2013, the Alabama Supreme Court denied Smith's petition for a writ of certiorari and issued a Certificate of Judgment. *Smith v. State*, No. 1110366 (Ala. Feb. 22, 2013).

### 2. Mitigation and Rebuttal Evidence

#### a. Clinical Social Worker Testimony

Smith's counsel presented testimony from Marjorie B. Hammock, MSW, LISW, a clinical social worker in Columbia, South Carolina. (Doc. 15-48 at 7.) At the time of the Rule 32 hearings, Ms. Hammock was licensed in independent level social work and had been in social work practice for forty-seven years. (*Id.* at 9.) She worked in the correctional system for fifteen years and as an assistant professor of social work at Benedict College for at least eight years. (*Id.*) Additionally, Ms. Hammock held a diploma in clinical social work from the National Association of Social Workers, and she was a member of the Academy of Certified Social Workers. (*Id.* at 10.)

Ms. Hammock prepared a biopsychosocial assessment of Smith. She explained that a biopsychosocial assessment is a standardized assessment tool used in social work, both in private practice and in clinical settings. (*Id.* at 13.) She collected information concerning the biological or physical, the psychological or behavioral, and the social history of Smith. (*Id.*)

As part of this project, she interviewed twenty-seven people who knew Smith (family, friends, educators, and those who had pertinent information about his life). She also visited Smith's home and reviewed Smith's school records, medical records, criminal records, Youth Offender Report, and various DHR records regarding child support applications. (*Id*. at 17-18.) Ms. Hammock spent about eighty hours working on Smith's case. (*Id*. at 36.)

Ms. Hammock testified about Smith's life history, determining as follows:

> The biopsychosocial assessment reveals a history of considerable violence, deprivation, family patterns of violence toward each other and others, considerable poverty, lack of resources for the family to survive, and a generational pattern of difficulties in meeting basic needs and taking care of the siblings as they came along. It also indicates that there is a very - - was and is a very close involvement of family members. They are related to each other. They are physically close to each other in many instances. And they share considerable - - shared problems that all participated in.

(*Id*. at 19-20.)

### b. Expert mental health evidence

Three mental health experts testified during the state post-conviction proceedings. Dr. Charles Josh Golden and Dr. Michael Scott Maher testified for Smith and Dr. Glen D. King testified for the State.

### i. Charles Josh Golden

During the second Rule 32 hearing, Smith's counsel presented the testimony of Dr. Charles Josh Golden, a board-certified clinical psychologist and

neuropsychologist.  (Doc. 15-47 at 90-91.)  At the time of the hearing, Dr. Golden had practiced for more than thirty-two years, with a specialty in neuropsychology and assessment.[9]  (Doc. 15-47 at 88-89.)

Dr. Golden evaluated Smith in November 2003.[10]  (*Id.* at 98.)  He gave Smith "a series of psychological and neuropsychological tests aimed at evaluating the main areas of attention, memory and executive function, as well [as] personality functioning in Mr. Smith."  (*Id.* at 98-99.)  In preparation for the hearing, Dr. Golden also reviewed (1) the 2005 tests administered to Smith by the State's expert, Dr. Glen D. King and Dr. King's interview notes; (2) Marjorie Hammock's interview notes; and (3) some of Smith's records.  (*Id.* at 100.)

Dr. Golden testified that Smith's brain is functioning at the borderline intelligence level, *i.e.*, "someone who is not normal, but also does not fall in the retarded range."[11]  (*Id.* at 100-01.)   Dr. Golden opined that Smith's brain impairment—the executive functioning problems and the borderline skills—existed

---

[9] Dr. Golden taught psychology at the university level since 1975, beginning as an assistant professor, then promoted to associate professor and then later to full professor of psychology.  (*Id.* at 93.)  Dr. Golden wrote twenty-four books in the field of neuropsychology or psychological assessment.  (*Id.* at 95.)

[10]  Dr. Golden estimated that he had spent about 30-40 hours on Smith's case.  (*Id.* at 139.)

[11] Although courts formerly employed the term "mental retardation," courts now use the term "intellectual disability" to describe the same condition. *See Ledford v. Warden, Georgia Diagnostic and Classification Prison*, 818 F.3d 600, 608 n.1 (11th Cir. 2016) (citing *Brumfield v. Cain,* 576 U.S. 305, 308 n. 1 (2015)). However, on occasion, courts use the terms "mental retardation" and "mentally retarded" when quoting or discussing earlier judicial opinions, court orders, trial testimony, or medical reports because those terms were used at the time. *Ledford*, 818 F.3d at 608 n.1.

as of 1995.  (*Id.* at 102.)  In Dr. Golden's opinion, Smith's brain dysfunction affected his judgment, his ability to conform his conduct to the requirements of law, his impulse control, and his ability to recognize the consequences of his actions.  (*Id.* at 102-03.)

Dr. Golden testified that he and Dr. King did not administer the same tests to Smith.[12]  (Doc. 15-47 at 125.)  Upon reviewing the results of Dr. King's testing, Dr. Golden concluded that the test results "fell well into the brain injured range and pointed to frontal lobe injury . . ." and that his own test results were similar to Dr. King's test results.  (*Id.* at 126-27.)

### ii.  Michael Scott Maher, M.D.

At the time of the hearings, Dr. Maher, a psychiatrist in Tampa, Florida, was board-certified in general and forensic psychiatry by the American Board of Psychiatry and Neurology.  Dr. Maher met with Smith once in June 2002 and interviewed him for approximately 2.5 hours.  (Doc. 15-37 at 205; Doc. 15-38 at 50.)  Dr. Maher administered a psychiatric exam, a mental status exam, a brief neurological exam, and interviewed Smith.  (Doc. 15-38 at 3.)

During the 2005 Rule 32 hearing, Dr. Maher testified that, upon considering Smith's self-reported history, his examination of Smith, and his review of records

---

[12]  For example, Dr. Golden gave Smith the WAIS-III (Doc. 15-47 at 143), while Dr. King gave Smith the older version of that test, the WAIS, (Doc. 15-46 at 174).

provided by counsel,[13] he diagnosed Smith as suffering from chronic and severe Post

Traumatic Stress Disorder ("PTSD")[14] and Poly Substance Abuse in Remission due

to his incarceration.  (Doc. 15-38 at 3, 6-7.)  Dr. Maher opined that Smith suffered

from these two conditions at the time of the offense.  (*Id.* at 4.)  Dr. Maher further

---

[13]   These records included Smith's Community Medical Arts Center records; school records; Alabama Department of Corrections and Tallapoosa County Jail records; Mount Meigs records; Lee County Youth Development Records; a Wal-Mart employment application; Alabama Department of Human Resources and Protective Services records; and Alabama Department of Human Resources Public Assistance records.  (Doc. 15-38 at 7-10.)

[14] Dr. Maher opined that Smith's PTSD resulted from the physical abuse to which he was subjected as a child, testifying as follows:

> . . . Smith described being brought up in a household where domestic violence was a chronic and continuing way of life.  It was present all the time to some degree or another.  It was present upon various different family members.  He had no perspective or opportunity as a child to understand that the – what he described as whuppings [sic] that he sustained as a child were in fact child abuse.  They were beatings and they were not an acceptable part of family discipline in raising a child.  He had the outlook that those things were simply a normal part of his background. . . .  he described a very clear and consistent and rather terrible pattern of child abuse.  He was hit with various different items, including a switch, a bottle, shoes.  He described that almost anything her mother could get her hands on he would be hit with.  He would be hit for various different reasons.  Sometimes he understood those reasons, sometimes he didn't, sometimes he thought that those reasons were good reasons.  If he got hit for fighting, he thought that was a fair reason to be hit.  On the other hand, if he was hit and he didn't understand why he was being hit or if he broke something and it was accidental, he didn't really think that was quite right, but he simply accepted it. . . .

> He describes being hit by his mother, by his older brother Reggie, by his step-fathers or men who were in the role of step-fathers, . . . and he describes being the constant witness of various different men hitting and beating and abusing his mother.

> All of those things are a part of the foundation of trauma that he experienced which created this Post Traumatic Stress Disorder.

(*Id.* at 16-17.)

opined that at that time, Smith was under the influence of extreme mental and emotional disturbance.  He also concluded that in February 1995, Smith was psychologically and emotionally immature for his age.  Although Smith was age 18, Dr. Maher surmised that he was functioning more like he was age 12 or 14 at that time.  (*Id*. at 5, 44.)

In summary, Dr. Maher testified that, at the time of the offense, Smith was acting under extreme duress (*Id*. at 91) and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (*Id*. at 90-91).

Dr. Maher testified again at the hearing in December 2007.  He reviewed the tests administered by Dr. Golden in 2003 and he reviewed the neuropsychological evaluations the State's expert, Glen D. King, performed in 2005.  Dr. Maher reiterated his opinion that, in 1995, Smith was suffering from a variety of brain impairments that were present at birth, viz., frontal lobe or executive functioning impairment, which affected his judgment and impulse control and impaired his ability to conform his behavior to the requirements of the law.  (Doc. 15-47 at 181-82.)

### iii.  Glen D. King

Dr. Glen D. King, a board-certified clinical psychologist with almost thirty years of experience, testified as a mental health expert for the State in both the 2005

and 2007 Rule 32 hearings. [15]  (Doc. 15-39 at 70-71; Doc. 15-46 at 142, 156.)  On May 10-11, 2005, Dr. King evaluated Smith at Holman for 4.5 to 5 hours each day. (Doc. 15-46 at 156, 168.)  Dr. King conducted a mental status examination and administered several tests.[16] (Doc. 15-46 at 165, 168, 192, 194, 195, 197.)  Based on the test results and his interview with Smith, Dr. King placed Smith in the high-borderline to low-average range of ability and concluded that Smith is not mentally retarded.  (*Id*. at 177.)  With respect to the neuropsychological findings, Dr. King found that Smith "has probably a learning disability involving reading[, but] [t]hat otherwise he is normal." (Doc. 15-46 at 204.)  Dr. King also found "no evidence to indicate frontal or temporal lobe damage or any kind of brain damage." (Doc. 15-46 at 204.)

Dr. King agreed and disagreed in part with the opinions of Smith's experts, Drs. Maher and Golden.  For example, he agreed that Smith suffered from borderline to low-average range of intellectual ability, neuropsychological impairments, difficulty with abstract reasoning, some learning disabilities, and auditory processing deficit. (Doc. 15-46 at 200; Doc. 15-47 at 25, 58-61.)  In addition, he

---

[15] Dr. King also taught psychology at Auburn University for twelve years.  (*Id.* at 74.)  In addition, he is trained to conduct court evaluations for the State to determine (1) if one is competent to stand trial, (2) mental state at the time of offense, and (3) if one is competent to waive *Miranda* rights, to waive counsel, etc.  (*Id.* at R-73.)  Dr. King has completed about 2,500 forensic assessments. (*Id.* at 71.)

[16] The tests were:  Halstead-Reitan Neuropsychological Test Battery; Wide Range Achievement Test (WRAT) III; Wechsler Adult Intelligence Scale (WAIS).  (Doc. 15-46 at 168, 177.)

agreed that Smith suffered from alcohol and drug abuse at the time of the offense. (Doc. 15-47 at 25, 27.) He further agreed that Smith was "immature for his age, probably," but that he could not agree with certainty that Smith was "psychologically and emotionally immature for his age." (Doc. 15-47 at 25-26.)

Dr. King disagreed with Dr. Maher's diagnosis that Smith was suffering from PTSD at the time of the offense. Dr. King found that Smith did not meet the specific criteria set forth in the Diagnostic and Statistical Manual for PTSD. (Doc. 15-47 at 21-23.) He also testified that records from Smith's confinement in the Lee County Youth Development Center and Mt. Meigs Campus of the Alabama Department of Youth Services two years before the incident do not include any findings or diagnoses from health officials noting any symptoms or signs of PTSD. (Doc. 15-47 at 23-25.)

Dr. King also disagreed with Dr. Maher's opinion that Smith was suffering from extreme emotional distress at the time of the incident and that he was unable to appreciate the wrongfulness of his actions at the time of the crime. Dr. King did acknowledge that Smith may have been under "some distress" at the time of the incident. (Doc. 15-47 at 26.) He found, however, that Smith was able to appreciate the wrongfulness of his actions at the time of the crime. (Doc. 15-47 at 26-27.)

     c.    <u>Lay testimony</u>

Smith's older brother, Reginald Smith, testified at the penalty phase of Smith's trial.  He also testified at the post-conviction hearing about the abuse Smith experienced as a child and the violence to which he and Smith were exposed in their household.

## F.   § 2254 Habeas Petition

On June 21, 2013, Smith initiated this habeas action by filing a § 2254 petition asserting the following claims:

1. The ACCA's denial of his claim of ineffective assistance of counsel is an unreasonable application of clearly established Supreme Court precedent since the facts show counsel's performance was deficient.

2. The ACCA's denial of his claim of ineffective assistance of counsel is unreasonable because clearly established Supreme Court precedent holds on facts equivalent to those here that a failure to investigate relevant mental health evidence is neither "strategic" nor "reasonable."

3. The ACCA's decision is an unreasonable application of established Supreme Court precedent under Strickland's prejudice prong and an unreasonable determination of the facts.

(Doc. 1 at 13-65.)

For the reasons that follow, this Court concludes that Smith's § 2254 petition should be denied without an evidentiary hearing and this case dismissed with prejudice.

## II. DISCUSSION

### A.    The AEDPA Review Standard

Because Smith filed this action after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court's review of his claims for federal habeas relief, which were resolved on the merits by the state courts, is governed by the AEDPA. *See Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1281 (11th Cir. 2012); *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under AEDPA, this Court cannot grant Smith habeas relief with respect to any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

"Clearly established federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta," of the United States Supreme Court's cases at the time of the

relevant state court decision. *Williams*, 529 U.S. at 412. "Contrary to" means the state court applied "a rule different from the governing law set forth in [Supreme Court] cases, or [ ] it decide[d] a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (alterations added).

An "unreasonable application" under § 2254(d)(1) occurs when a state court decision (1) "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

An "unreasonable application" of federal law occurs "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original). "Indeed, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Renico*

*v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411). Rather, the state court's application of federal law "must be 'objectively unreasonable.' This distinction creates 'a substantially higher threshold' for obtaining relief than *de novo* review." *Id.* (quotations omitted); *White v. Woodall*, 572 U.S. 415, 419 (2014) (explaining that, for purposes of § 2254(d)(1), the state court's application of clearly established federal law must be "objectively unreasonable, not merely wrong; even clear error will not suffice" (quotation omitted)). "[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion ... a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, —– U.S. —, 138 S. Ct. 1188, 1192, 200 L.Ed.2d 530 (2018).

A state court's decision is reasonable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. Rather, a petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Further, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits." *Greene v. Fisher*, 565 U.S. 34, 38 (2011). Section 2254(d)(1) requires federal courts to "focus[ ] on what a state court knew and did" and to evaluate the reasonableness of the state court's decision "against [the Supreme] Court's precedents as of the time the state court render[ed] its decision." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (quotation omitted).

When evaluating whether a state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under § 2254(d)(2), the federal court "may not characterize . . . state-court factual determinations as unreasonable 'merely because [the federal court] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Section 2254(d)(2), like § 2254(d)(1), requires that federal courts afford the state court "substantial deference." *Id.* If "[r]easonable minds reviewing the record might disagree about" the state court factfinding in question, "on habeas review that does not suffice to supersede" the state court's factual determination. *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). Additionally, a federal habeas court must presume that findings of fact made by state courts are correct, unless a petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. §

2254(e)(1).  "When considering a determination of a mixed question of law and fact, such as a claim of ineffective assistance of counsel, the statutory presumption of correctness applies to only the underlying factual determinations."  *Tanzi v. Sec'y, Fla. Dep't of Corr*., 772 F.3d 644, 651 (11th Cir. 2014) (citations omitted).

In sum, AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  *White v. Wheeler*, 577 U.S. 73, 77 (2015) (per curiam) (quotation omitted).  But the Supreme Court has explained, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review."  *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).  "Deference does not by definition preclude relief."  *Id*.  "[I]f a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release."  *Trevino v. Thaler*, 569 U.S. 413, 421 (2013).

If a federal court determines that a state court decision is unreasonable under § 2254(d), "[the federal court is] unconstrained by § 2254's deference and must undertake a *de novo* review of the record."  *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1255 (11th Cir. 2013) (quotation omitted).

**B.    The Ineffective Assistance of Counsel Claims**

**1.  The § 2254 Standard as Applied to the *Strickland* Standard**

Smith asserts that the ACCA's and Rule 32 court's determination that defense counsel was not ineffective for failing to investigate his mental health problems and additional family history and failing to present this evidence in mitigation at the penalty phase is based on an unreasonable application of clearly established federal law and an unreasonable determination of the facts.  He also contends that counsel was ineffective for failing to object to the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel as compared to other capital murders.

In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Supreme Court established the constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.  *See Cullen*, 563 U.S. at 189 ("There is no dispute that the clearly established federal law here [in an ineffective-assistance case] is

23

*Strickland v. Washington*."); *Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000) (quoting *Strickland*, *supra* at 687).[17]

To satisfy the first prong of *Strickland*, *i.e.*, establish that counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams*, 529 U.S. at 390–91; *Strickland*, 466 U.S. at 688. The defendant has the burden of proof and must overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 687–91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate

---

[17] *See also Hinton v. Alabama*, 571 U.S. 263, 264 (2014) (per curiam) (citing *Strickland*, *supra* at 687).

decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-89; *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam).

To satisfy the second prong of *Strickland*, "the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. Prejudice occurs when there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In the capital sentence context, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. at 695. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. In determining whether there is a reasonable probability of a different result, a court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams*, 529 U.S. at 397–98).

"[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Renico*, 559 U.S. at 776 ("Because AEDPA authorizes federal courts to grant relief only when

25

state courts act unreasonably, it follows that '[t]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" (quoting *Yarborough*, 541 U.S. at 664)).

Importantly, "whether defense counsel's performance fell below *Strickland*'s standard" is not the question before a federal habeas court reviewing a state court's decision under § 2254. *Harrington*, 562 U.S. at 101.

> Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different ... [for] [a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id*. Accordingly, where, as here, "§ 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105. Consequently, "[f]ederal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Id*.

## 2. The Presentation of Mitigating Evidence

### a. Deficient Performance

Smith claims that his counsel performed deficiently at the penalty phase because they failed to investigate his mental health issues for mitigating evidence,

failed to have him evaluated by a mental health professional, and failed to present the mitigating evidence through medical expert testimony to the jury at the penalty phase. Smith avers that, in the absence of a mental health evaluation, counsel had no expert testimony to present in mitigation at the penalty phase and could offer nothing more than a request for mercy and lay testimony, predominantly from his family members, to humanize him.

During the 2005 Rule 32 hearing, Attorney Singleton stated that he decided not to investigate or present any mental health evidence or obtain the services of a mental health expert because he was preoccupied with keeping other crimes evidence out of the case. Singleton explained the rationale for his decision:

> . . . It wasn't tactical, wasn't strategic, there's no excuse for our failure to develop it. Both those omissions, which are glaring, stem from the third point to which this testimony could have been used, and I think, shows our misread of the case.
>
> We didn't use expert testimony at the penalty phase before the jury for one simple reason. I misread the delay [sic] of the government's case to what it's evidence and aggravators were going to be.
>
> I knew early on in the case. And, I don't know if I knew from the DA, the Assistant DA, I could have gotten a phone call from another defense attorney, that Mr. Smith had another active pending felony case in an adjacent jurisdiction. The case testified [sic] me. Why? Because the facts all too closely paralleled what the charged case was in Tallapoosa County.
>
> . . .

. . .  So to prevent - - my misread was overestimating the potential devastating [e]ffect of that thing that never materialized.  It just wasn't a problem.  But it dominated my thinking.  I let it tie our hands.  As a result I let it cripple the defense of Mr. Smith in the penalty phase of the case.

So, did I have a reason for not developing mental health testimony at the penalty phase?  You betcha, but it was a reason that was faulty.  It was [not][18] based on investigation.  It wasn't based on seeing what was out there and developing as best we could potential mental health.  It totally reflected a unilateral decision by me, not by Mr. Sims, that it was a road that we couldn't even take a step down much less go the whole distance because of the risk that we would open the door to this other assault, and that was wrong.  It was a mistake.

(Doc. 15-38 at 115-17.)

Singleton further explained that he made this decision without conducting any

investigation:

Q.    And so when you looked at the Other Acts Evidence that you had become aware of and looked at the possibility of mental health

---

[18]  The word "not" does not appear in the transcript of Singleton's testimony at Doc. 15-38 at 116. However, attached to Petitioner Corey Smith's Post-Rule 32 Evidentiary Hearing Brief (Doc. 15-36 at 102-34) is the affidavit of Palmer Singleton dated August 29, 2005, which states that the transcript of his testimony should have included the word "not" in the subject sentence. Specifically, Singleton explains:

4.  I have reviewed pages 212-215 of the transcript of my July 25 testimony. At page 214, lines 21 – 22, the transcript reads that my decision to not develop or present expert mental health evidence on Mr. Smith's behalf "was based on investigation."  This is not accurate, not correct, and not my testimony.  To be accurate, correct and reflect my testimony, the transcript needs to be corrected by adding the word "not" before "based on investigation."  Without this correction, the transcript is in error and misrepresents the facts and my testimony.

(Doc. 15-36 at 134.)

28

expert testimony, is it a fair statement to say you made a choice not to put on the mental health expert testimony?

A.   Not any meaningful choice because I never did the background work, roll up my sleeves and got into it to see what was available, what the potential was.  *Instead I made this categorical decision in the abstract that nothing could offset the risks of opening the door to tainting the jury with evidence about these other violent episodes.*

(*Id.* at 134 (emphasis added).)

In rejecting the claim that Smith's counsel were constitutionally ineffective for not investigating his mental health issues, the Rule 32 court stated:

.  .  .  Based on this Court's review of the record and this Court's understanding of his counsel's testimony of the evidentiary hearing in 2005, this Court finds that his counsel's penalty phase strategy was to humanize Smith by presenting evidence through *sixteen* witnesses about his troubled childhood, his young age at the time of the crime, his exposure to violence in the home, his relationship with his daughter, and his efforts to better himself so that he could care for his daughter.  . . .

In sum, this Court finds that Smith's counsel decided to present evidence to the jury that would humanize him and focus the jury's attention on the impact of a death sentence on his family. Their decision was reasonable and strategic, and this Court will not "second-guess" it.  *See*, *Crawford*, 311 F.3d at 1312 .  .  .  .

(*Id.* at 119-20 (emphasis in original).)

Smith asserts that he is entitled to habeas relief pursuant to § 2254(d) because *Strickland* and its progeny, including *Wiggins*, 539 U.S. at 534, and *Rompilla v. Beard*, 545 U.S. 374 (2005), hold on facts indistinguishable from those here that a failure to investigate relevant mental health evidence is neither "strategic" nor

"reasonable." (Doc. 25 at 48.) Specifically, he contends that counsels' decision not to investigate his mental health was based solely on the fear of opening the door to a serious pending felony charge and, therefore, was not a "strategic decision." (*Id.*)

"[S]trategic choices made [by trial counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. This means "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

In this case, however, it unnecessary to assess whether the decision by Smith's counsel not to pursue a mental health investigation was the product of a reasoned strategic choice, because, upon careful review of the record, the Court finds that the ACCA's determination that Smith did not satisfy the prejudice prong was neither contrary to, nor an unreasonable application of, *Strickland*.

    b.  <u>Prejudice</u>

On appeal of the denial of the Rule 32 petition, the ACCA determined Smith failed to make the requisite showing of prejudice. Unless a petitioner satisfies the showings required in both prongs of the *Strickland* inquiry, relief should be denied. *Strickland*, 466 U.S. at 687. Once a court decides that one of the requisite showings

has not been made, it need not decide whether the other one has been. *Id*. at 698; *see Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998). *See also Jennings v. Secretary, Florida Dep't of Corr.*, 55 F.4th 1277 (11th Cir. 2022) (a capital habeas case wherein the court decided "not [to] address [the petitioner's] arguments related to the performance prong because the Florida Supreme Court's determination that [the petitioner] failed to establish prejudice was not contrary to, or an unreasonable application of, *Strickland* or based on an unreasonable determination of the facts."); *Pye v. Warden, Georgia Diagnostic Prison*, 50 F.4th 1025, 1033-34 (11th Cir. 2022) (a capital habeas case wherein the court assumed counsel's performance was deficient and evaluated only the state court's conclusion that the petitioner was not prejudiced by the alleged deficiencies).

The ACCA denied Smith's ineffective assistance claim on prejudice grounds. Smith challenges the ACCA's determination that he failed to meet the prejudice prong of *Strickland*, specifically asserting:

(1) The ACCA's decision unreasonably applied *Strickland* and is based on an unreasonable determination of the facts in finding that the evidence from Smith's post-conviction mental health experts was "largely controverted" since the State's sole expert confirmed the existence of numerous mitigating factors (Doc. 25 at 64-66);

(2) The ACCA's decision is based on an unreasonable determination of the facts in finding that the opinions of Smith's post-conviction mental health experts were "largely controverted" by the opinion of the State's sole expert since the evidence showed the clear lack of qualifications of the State's expert when compared to those of Smith's experts (*Id*. at 66-68);

31

(3) The ACCA's decision unreasonably applied the law and is based on an unreasonable determination of the facts in finding that the mitigating evidence which would have been presented by Smith's post-conviction mental health experts was "cumulative" of the testimony of the previous lay witnesses (*Id*. at 68-71);

(4) The ACCA unreasonably applied established law in finding it is confident Smith's mental health evidence would have had no impact on the results in the penalty phase (*Id*. at 72-75); and

(5) The ACCA's decision unreasonably applied *Strickland*'s prejudice prong and is based on an unreasonable determination of the facts because the totality of the mitigating evidence, when weighed against the aggravating evidence, shows there is a reasonable probability the sentence would have been different (*Id*. at 76-83).[19]

As explained previously, in assessing prejudice under *Strickland* in a capital case, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

It was reasonable for the ACCA to conclude that counsels' failure to present the mitigation evidence in question was not prejudicial. In assessing the reasonable probability of a different result, the state court's task was to determine whether there was a substantial likelihood that the outcome would have been different by weighing the aggravating evidence and totality of the mitigating evidence—both that adduced at trial and during the habeas proceeding. *Porter*, 558 U.S. at 41; *see also*

---

[19] This Court will address Smith's assertions out of order.

*Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). This Court does not know precisely which aggravating and mitigating factors the jury may have implicitly found before unanimously recommending a sentence of death, 12-0.[20] At sentencing, the trial court found two statutory aggravating factors: (1) the kidnapping of the victim, *see* Ala. Code § 13A-5-49(4); and (2) the capital offense was particularly heinous, atrocious, and cruel ("HAC") when compared to other capital offenses, *see id*. § 13A-5-49(8). The trial court also found three statutory mitigating circumstances: (1) Smith had no significant history of prior criminal activity, *see id*. § 13A-5-51(1); (2) the capital offense was committed while Smith was under the influence of extreme mental or emotional disturbance,[21] *see id*. § 13A-5-51(2); and (3) Smith was 18 years old at the time of the crime, *see id*. § 13A-5-51. In addition, the trial court found some non-statutory mitigating circumstances, including: (1) Smith's "environment had a role in making [Smith] what he is," noting there was "never an appropriate male figure in his household," that he knew that his father had abused his mother, and that at least one of his brothers had a criminal history; (2) Smith had

---

[20] Under Alabama law, the jury's recommendation for a sentence of death must be based on the vote of at least ten jurors. Ala. Code § 13A-5-46(f). At the time of Smith's trial, Alabama's judicial override scheme allowed a sentencing judge to reject a jury's recommendation of life imprisonment and sentence a defendant to death in a capital case. *See Madison v. Comm'r*, 677 F.3d 1333, 1336 (11th Cir. 2012). Therefore, the trial court, based on its independent determination and weighing of the aggravated circumstances, made the final decision as to the appropriate sentence. *See* Ala. Code § 13A-5-47(d)-(e) (1995). Alabama has since amended its capital sentencing scheme, and a judge can no longer override the jury's sentence. *See* Ala. Code § 13A-5-47(a).

[21] The trial court accorded little weight to this factor. (Doc. 15-52 at 14-15.) The trial court suggested that Smith's "emotional distress [had] a great deal more to do with his relationship to Kimberly Brooks than with his daughter, Labreasha." (*Id*. at 16.)

a speech impediment and was teased as a child; (3) Smith gave helpful information to authorities within 24 hours of the offense; and (4) Smith's family and friends care about him.  Thus, the question for the Rule 32 court and the ACCA was whether the mitigation evidence presented at trial considered with the additional mitigation evidence presented in the postconviction Rule 32 proceedings would have outweighed the aggravating factors found by the trial court.

The Rule 32 court answered the question by concluding that "'there is no reasonable probability that the presentation of evidence regarding Smith's alleged mental health problems would have altered the jury's unanimous recommendation of a death sentence or the trial court's finding that the aggravating circumstances "far outweigh" the mitigating circumstances.'" *Smith*, 122 So. 3d at 231 (quoting the Rule 32 court's order, Doc. 15-46).  The ACCA also concluded as follows:

> We are confident, as was the postconviction court, that presenting evidence of Smith's mental health, which was in large part disputed by the State's expert, and even more evidence of his upbringing, would have had no impact on the results in the penalty phase of Smith's capital-murder trial.

*Smith*, 122 So. 3d at 239. This Court will now address Smith's specific claims challenging the ACCA's determination that he was not prejudiced by counsels' omission of evidence of mental health and additional evidence of his upbringing with the ACCA's conclusion in mind.

i.  The Lay Witness Finding

Smith asserts that the ACCA's finding that "the testimony of [] Smith's mental experts at the post-conviction hearing was merely 'cumulative' of the lay witnesses who testified during the penalty phase" (Doc. 25 at 77) is an unreasonable determination of the facts.  Smith misreads the ACCA's opinion. The ACCA did not find that the mental health experts' opinions regarding his mental health conditions were cumulative of lay witness testimony presented during the penalty phase. Rather, on appeal of the denial of the Rule 32 petition, the ACCA specifically found that "[t]he vast majority of the testimony *concerning Smith's family and his upbringing* that was presented at the 2005 and 2007 evidentiary hearings had been presented by the 16 witnesses who testified during the penalty phase of Smith's trial." *Smith*, 122 So. 3d at 224 (emphasis added).  "[A] petitioner cannot satisfy the prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented." *Rose v. McNeal*, 634 F.3d 1224, 1243 (11th Cir. 2011). Therefore, to the extent Smith challenges this finding, this Court will discuss whether the ACCA's finding was an unreasonable application of the facts as applied to *Strickland*.

In general, "mitigating evidence presented in postconviction proceedings is cumulative 'when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury.'" *Dallas v. Warden*, 964 F.3d 1285, 1308 (11th Cir. 2020) (quoting *Holsey v. Warden,*

*Georgia Diagnostic Prison*, 694 F.3d 1230, 1260-61 (11th Cir. 2012)); *Boyd v. Allen*, 592 F.3d 1274, 1297–98 (11th Cir. 2010) (finding that much of the evidence presented by the petitioner during postconviction proceedings "was in some measure cumulative" of the trial evidence because "much (although not all) of the 'new' testimony introduced at the post-conviction hearing would simply have amplified the themes already raised at trial"); *Rhode v. Hall*, 582 F.3d 1273, 1287 (11th Cir. 2009) ("At best, the evidence would have been cumulative, providing more information about [the petitioner]'s bad childhood and early exposure to drugs and alcohol.").

Testimony concerning Smith's family life and his childhood was presented during both the penalty phase of trial and during the Rule 32 hearings. The ACCA found that, during the penalty phase, Smith "present[ed] evidence through sixteen witnesses about his troubled childhood, his young age at the time of the crime, his exposure to violence in the home, his relationship with his daughter, and his efforts to better himself so that he could care for his daughter" and that twelve of those witnesses were family members who "testified as to their love for him and his importance to their family and asked the jury for mercy." *Smith*, 122 So. 3d at 229 (quoting Tallapoosa Rule 32 court order, Doc. 15-46 at 119) (emphasis omitted).

During the 2007 Rule 32 hearing, Marjorie Hammock testified that, as part of her biopsychosocial assessment, she interviewed twenty-seven people, including

family, friends, and educators.   The interview summaries were admitted into evidence.  (Doc. 15-43 at 221- 247; Doc.15-47 at 28, 47.) Based on the interviews of these lay people, as well as other evidence, including educational and juvenile records gathered during her assessment, Ms. Hammock found that Smith's past was filled with family patterns of violence, considerable poverty, and very close involvement of family members with shared problems.  (Doc. 15-48 at 19-20.)  In addition, the mental health experts reviewed and testified about information derived from the witness summaries. During the 2005 Rule 32 hearing, Smith's brother, Reginald Bernard Smith ("Reginald"), also testified about drug usage, as well as instances of domestic violence in the home, including occasions when his mother was threatened or assaulted by her ex-husband, when he assaulted Smith, and when he struck his girlfriend in front of Smith.

This Court recognizes that Reginald's testimony and the information in the witness summaries prepared by Marjorie Hammock and presented during the Rule 32 proceedings are more detailed than the witness testimony presented during the penalty phase and present a sad story.  Nonetheless, to the extent the ACCA found that the brother's testimony and the testimony from the experts (when referencing information derived from the summaries of lay persons) concerning Smith's family and his upbringing that was presented during the Rule 32 hearings had been presented by the lay witnesses who testified during the penalty phase of trial, this

Court cannot conclude that the finding is an unreasonable determination of the facts.[22]   Importantly, as found by the ACCA, the aggravating factors were overwhelming. This Court accords deference to the ACCA's determination that adding Reginald's testimony and the statements of lay witnesses interviewed by Ms. Hammock would not have sufficiently changed the balance of those factors, especially in light of the facts demonstrating the heinous, atrocious, and cruel circumstances.

> ii.    The Mental Health Experts

Smith challenges the ACCA's finding that the evidence from Smith's mental health experts was "largely controverted" because (1) his mental health experts were more qualified than the State's expert, and (2) the State's expert agreed with some of the defense experts' findings. [23]

---

[22] In his reply brief, Smith argues that it was error for the Rule 32 court and ACCA to find the evidence was cumulative under Rule 403 of the Alabama Rules of Evidence.  (Doc. 27 at 36-39.)  The state courts, however, did not specifically state that the evidence was cumulative on this basis.

[23] Buried within his claim challenging the ACCA's finding that his mental health experts' opinions were "largely controverted" is a separate assertion that the ACCA unreasonably applied *Strickland* by adopting verbatim the Rule 32 court's order (which was substantially similar to the State's proposed order).  He contends the ACCA's recitation of the Rule 32 court's order establishes that the ACCA failed to conduct their own independent assessment of the totality of the evidence in mitigation.  The Court recognizes there are limited circumstances in which a state habeas court's adoption verbatim of the State's proposed order is not accorded deference.  For example, in *Jefferson v. GDCP Warde*n, 941 F.3d 452, 455-45 (11th Cir. 2019), the Eleventh Circuit determined that the state habeas court's fact-finding was not entitled to deference pre-AEDPA because the state habeas court adopted the State's proposed order without allowing the petitioner to challenge or propose an alternative order and, apparently, without reviewing the proposed order itself.  Such limited circumstances, however, are not applicable here.

Smith filed this action after AEDPA became effective and he was given an opportunity to present the facts in a state post-conviction proceeding and on appeal.  The Eleventh Circuit has held that a state court's verbatim adoption of a state's proposed order is an "adjudication on the merits" and is entitled to

### 1. The Challenge to Dr. King's Opinions

Smith asserts the ACCA's finding that his mental health experts' opinions were "largely controverted" by the State's expert, Dr. King, is an unreasonable determination of the facts because, he says, the evidence shows Dr. King has less qualifications than those of the defense experts. (Doc. 25 at 66-68.) In other words, Smith asserts the state courts should not have relied on Dr. King's testimony and opinions because Dr. Maher, Dr. Golden, and Ms. Hammock have more academic achievements and professional experience.

Drs. King, Golden, and Maher were all found qualified to testify as experts. At the time of the Rule 32 hearings, Dr. King was a board-certified clinical psychologist with almost thirty years of experience. Dr. Golden was a board-certified clinical psychologist and neuropsychologist with thirty-two years of

---

AEDPA deference when both the petitioner and the State had an opportunity to present their version of facts to the court. *See Jones v. GDCP Warden,* 753 F.3d 1171, 1182–83 (11th Cir. 2014) ("Considering that a summary disposition of a *Strickland* claim qualifies as an adjudication on the merits, ..., we can discern no basis for saying that a state court's fuller explanation of its reasons—albeit reasons drafted for the court by the State—would not be entitled to AEDPA deference."); *Brownlee v. Haley,* 306 F.3d 1043, 1067 n.19 (11th Cir. 2002) (upholding the use of proposed orders adopted verbatim by trial judges "as long as they were adopted after adequate evidentiary proceedings and are fully supported by the evidence") (citations omitted); *Rhode v. Hall,* 582 F.3d 1273, 1281-82 (11th Cir. 2009) (both parties had the opportunity to present the state habeas court with their version of the facts).

In Smith's case, the determinations of the Rule 32 court were made after conducting a hearing in which both parties were allowed to submit briefing and present their case. Likewise, the determinations of the ACCA were made after each party submitted extensive briefing. Therefore, the ACCA's determinations are entitled to AEDPA deference. To the extent Smith argues the ACCA unreasonably applied *Strickland* by quoting the Rule 32 court's order which adopted the State's proposed order, he is entitled to no relief.

experience. The Rule 32 court accepted Dr. King and Dr. Golden as mental health experts. Dr. Maher, a psychiatrist, was certified in general and forensic psychiatry by the American Board of Psychiatry and Neurology. The Rule 32 court accepted Dr. Maher as an expert in the fields of psychiatry and forensic psychiatry. (Doc. 15-37 at 205.) In addition, the state court found Ms. Hammock, MSW, LISW, a clinical social worker licensed in independent level social work with forty-seven years of experience, including fifteen years of work in the correctional system, eight years as an assistant college professor, and several years conducting biosocial assessments, qualified to testify as an expert.

Faced with conflicting expert testimony, the ACCA found the defense experts' testimony was to a large extent controverted by Dr. King's testimony. The ACCA determined that presenting the conflicting evidence of Smith's mental health and even more evidence of his upbringing would have had no impact on the results in the penalty phase and, therefore, he failed to meet the prejudice prong of *Strickland*. In determining the facts, it was not unreasonable for the state court to view the evidence of Smith's alleged brain damage or other mental health impairments as conflicting and to question the severity of his condition based on the evidence presented. *See Pye*, 50 F.4th at 1050 (determining in a case with conflicting expert testimony, including Dr. King's testimony, regarding the petitioner's alleged brain damage, it would have been reasonable for the state court to find that the

petitioner had cognitive deficits but not frontal-lobe impairment or fetal-alcohol syndrome). This Court cannot conclude that the ACCA's determination was unreasonable in light of the evidence before the state court.

### 2. *The Experts' Agreement*

Smith asserts that the ACCA's determination that the opinions of his mental health experts were "to a large extent controverted" by the State's expert is an unreasonable determination of the facts as applied to *Strickland* because Dr. King did not disagree with some of the defense experts' opinions. (Doc. 25 at 73.) Smith contends a jury should have an opportunity to consider several factors agreed upon by his experts and the State's expert at the penalty phase because Dr. King expressly agreed with the other mental health experts' opinions that he suffered from brain impairment in the form of difficulties with abstract reasoning and concept formation; lower intellectual functioning; learning disabilities; dyslexia; auditory processing defect; substance abuse; childhood physical abuse; and immaturity for his chronological age. (*Id*. at 65–66.)

The fact that Dr. King may have agreed with both Dr. Golden and Dr. Maher about some matters does not establish that the ACCA unreasonably determined that the opinions of the defense experts were "to a large extent controverted." The experts' opinions about Smith's alleged major mental health diagnoses were conflicting. The ACCA provided several examples in which Dr. King disagreed with

Smith's experts.  For example, the ACCA pointed to Dr. King's opinion that Smith had a full-scale IQ score of 90 and functioned at the "high-borderline to low-average range" of intellectual ability, that Smith did not meet the criteria for PTSD, that there was no evidence indicating frontal or temporal lobe damage, and that there was no evidence suggesting Smith had any serious psychiatric or psychological disorder. *Smith*, 122 So. 3d at 235-36.  The ACCA also discussed Dr. King's disagreement with Dr. Golden's method of intelligence testing, specifically noting his concern that Dr. Golden did not record some of Smith's responses. *Id*. at 236.  This Court cannot conclude that the ACCA's determination that the defense experts' opinions were largely controverted was an unreasonable determination of the facts as applied to *Strickland*.

> ### iii.    Application of Clearly Established Law

Importantly, after summarizing the testimony of the mental health and mitigation experts and applying clearly established federal law as determined by the United States Supreme Court in *Strickland* and its progeny, the ACCA determined that presenting evidence of Smith's mental health would have had no impact on the results in the penalty phase of the trial.  Smith asserts that the ACCA unreasonably applied *Strickland*, *supra*, and its progeny in determining that he was not prejudiced by counsels' failure to investigate and present mental health evidence during the penalty phase of trial. (Doc. 25 at 72-75.)  He asserts the Supreme Court's decision

in *Porter v. McCollum*, 558 U.S. 30 (2009), establishes that counsels' failure to investigate and present mental health evidence constitutes prejudice under the *Strickland* standard.

In *Porter*, the Supreme Court, reviewing the element of deficiency *de novo*, held that counsel representing defendant, a Korean war veteran who murdered his former girlfriend, provided deficient representation in penalty phase of a capital murder case by failing to uncover and present any mitigating evidence regarding defendant's mental health, family background, or military service. 558 U.S. at 39-40. During the state postconviction hearing, evidence established that the defendant served heroically during traumatic battles of the Korean war.  In addition, an expert in neuropsychology testified that the defendant suffered from brain damage that could manifest in impulsive and violent behavior, and the defendant's siblings offered deposition testimony regarding defendant's alcohol abuse and his abusive childhood. The Court also determined that the Florida Supreme Court unreasonably applied *Strickland* in holding the defendant was not prejudiced by that deficiency. *Id*., 558 U.S. at 40.

The circumstances of Smith's case, however, are distinguishable.  In *Pye v. Warden, Georgia Diagnostic Prison*, the Eleventh Circuit recently discussed the *Porter* decision, specifically noting that *Porter* "didn't create a per se rule that the failure to present evidence of brain damage or cognitive deficits is always

prejudicial; rather, it held only that *in that case, given that particular petitioner's brain damage, the failure to present mental-health evidence was prejudicial*." 50 F.4th 1025 (11th Cir. 2022) (citing *Porter*, 558 U.S. at 43–44; *see also Richter*, 562 U.S. at 101 (explaining that in evaluating whether a state court's application of federal law was unreasonable, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations"); *Knowles*, 556 U.S. at 123 (noting that *Strickland* is a "general standard")). And the petitioner in *Porter*, in contrast to Smith, presented largely *unrebutted* evidence that he had PTSD from his military service that could manifest in impulsive and violent behavior. 558 U.S. at 36. Moreover, the Florida Supreme Court rejected the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. *Porter*, 558 U.S. at 42. Therefore, Smith's case is significantly different.

In a footnote, Smith also cites to other cases in which the Supreme Court found counsel was ineffective for failing to investigate mitigating evidence. The Court notes that in several of the cases on which Smith relied—*Wiggins*, *Rompilla*, and *Williams*—AEDPA deference did not apply to the prejudice prong. *See Wiggins*, 539 U.S. 510, 534 (2003) (explaining that because the state court never addressed the prejudice prong, the Supreme Court's "review [was] not circumscribed by a state court conclusion with respect to prejudice"); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (reviewing the prejudice prong *de novo* because the state court "never

reached the issue of prejudice"); *Williams*, 529 U.S. at 391, 395, 398; *see also Pinholster*, 563 U.S. at 202 (explaining that it "did not apply AEDPA deference to the question of prejudice in [*Williams* and *Rompilla*]"). Smith also cites to *Brownlee v. Haley*, 306 F.3d at 1071-75, a pre-AEDPA case in which the Eleventh Circuit found a defendant was prejudiced by counsel's failure to investigate mitigating mental health evidence.  As the Supreme Court has cautioned, because it "did not apply AEDPA deference to the question of prejudice in those cases," they "offer no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking"—which is the question we must answer in this case. *Pinholster*, 563 U.S. at 202 (emphasis in original).

In short, the balance of aggravating and mitigating factors is significantly different in Smith's case than in the precedent he cites. And no Supreme Court precedent applying AEDPA to state-court prejudice determinations compels a different result. The Court concludes that the ACCA's determination that Smith failed to establish prejudice "was not so obviously wrong as to be beyond any possibility of fairminded disagreement." *Gavin*, 40 F.4th 1247, 1270 (11th Cir. 2022) (quoting *Shinn v. Kayer*, ––– U.S. –––, 141 S. Ct. 517, 526, 208 L.Ed.2d 353 (2020)).

### 3.  The Heinous, Atrocious, and Cruel Aggravating Factor

Smith asserts the ACCA "unreasonably applied *Strickland*'s prejudice prong and unreasonably determined the facts under 28 U.S.C. §2254(d)(1) and (2) respectively by . . . uncritically accepting the circuit court's findings regarding Mr. Smith's claim that his counsel were ineffective in failing to object to §13A-5-49(8), Ala. Code 1975 ("The capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses"). . . ."  (Doc. 25 at 85.)  Smith raised the ineffectiveness claim in his state post-conviction petition and on collateral appeal to the ACCA, and it was denied on the merits.  *See Smith*, 122 So. 3d at 239-242.

Smith's assertion that the ACCA "uncritically accepted" the Rule 32 court's findings by quoting extensively from the Rule 32 court's order is unavailing.  The Court recognizes that the ACCA cited to sections of the state courts' orders and opinions when discussing whether counsel was ineffective for failing to object to certain facts related to the HAC finding. *See Smith*, 122 So. 3d at 239-241.  The ACCA, however, also found that the Rule 32 court's findings were supported by the record and by caselaw, *id*. at 241, and conducted its own critical analysis, specifically finding:

> . . . In determining the application of this aggravating circumstance "we must consider whether the violence involved in achieving the killing went beyond what was necessary to cause death, whether the victims experienced appreciable suffering after a swift assault, and whether there was psychological torture." *Brownfield v. State*, 44 So. 3d 1, 41 (Ala. Crim. App.2007).

"One factor this Court has considered particularly indicative that a murder is 'especially heinous, atrocious or cruel' is the infliction of psychological torture. Psychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture 'must have been present for an appreciable lapse of time, sufficient enough to cause prolonged or appreciable suffering.' *Norris v. State*, 793 So.2d 847, 861 (Ala. Crim. App. 1999)."

*Ex parte Key*, 891 So. 2d 384, 390 (Ala.2004). *See Ex parte Rieber*, 663 So. 2d 999, 1003 (Ala. 1995). "[E]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, or cruel." *Ex parte Rieber*, 663 So. 2d 999, 1003 (Ala. 1995). *See also Chavez v. State*, 832 So.2d 730, 765 (Fla. 2002) ("'In numerous cases the Court has held that this aggravating factor [that the offense was heinous, atrocious, or cruel] could be supported by evidence of actions of the offender preceding the actual killing, including forcible abduction, transportation away from possible sources of assistance and detection, and sexual abuse.'" (quoting *Swafford v. State*, 533 So.2d 270 (Fla. 1988))).

By anyone's definition, Kimberly Brooks's murder was especially heinous, atrocious, or cruel as compared to other capital murders. Smith and his two codefendants, Sanjay Brooks and Shontai Smith, forced Brooks into their vehicle and drove her to an isolated area. Smith shot Brooks once in the chest and then in the head. They left her for dead. When they returned to dispose of her body they found Brooks standing by the road in a daze. They put Brooks in their vehicle and drove around discussing among themselves how they would kill her and then dispose of her body. Brooks begged to be taken to a hospital to get medical attention. Eventually they stopped the vehicle and Sanjay Brooks told Smith and Shontai Smith to "finish her off." Smith poured gasoline over her and they put a bag over her head until she lost consciousness and then they set her body on fire. After the initial gunshots rendered Smith helpless to prevent her death she suffered great psychological torture as she listened to her abductors discuss how they were going to kill her and dispose of her body while she begged for medical attention. The violence inflicted on Brooks far

exceeded that necessary to cause her death, and she suffered for an appreciable period of time. Counsel was not ineffective for failing to argue that the murder was not especially heinous, atrocious, or cruel as compared to other capital murders. . . .

*Smith*, 122 So. 3d at 241–42.

Smith challenges the ACCA's findings of fact, specifically asserting the ACCA unreasonably determined: (a) the victim was burned alive; and (b) the victim was subjected to psychological torture.[24]  (Doc. 25 at 87.)

a.  The Timing of Death

Smith argues that, "[i]n its determination of *Strickland*'s prejudice prong, the ACCA failed to address that the trial court erred in applying the 'especially heinous, atrocious or cruel' aggravating factor on the grounds that the victim was 'burned alive' when, in fact, the controlling issue is whether the victim was conscious or aware and where the trial court admitted having 'no way of knowing' she was even conscious." (Doc. 25 at 80.)  Smith mischaracterizes the trial court's findings. When discussing the HAC factor, the trial court found:

> In sentencing Smith to death, the trial court found that the aggravating circumstances 'far outweigh all the mitigators that can be compiled in favor of him.' In explaining why the two aggravating circumstances outweighed the statutory and nonstatutory mitigating circumstances, the trial court stated:
>
> > After giving full measure and weight of each of the aggravating and mitigating circumstances, and taking into

---

[24] To the extent Smith attempts to challenge the sufficiency of the evidence with respect to the HAC aggravating circumstance, this claim is procedurally defaulted and therefore not before this Court.

48

account the recommendation of the jury contained in its advisory verdict, it is the judgment of the court that [the] aggravating circumstances outweigh [the] mitigating circumstances shown by the evidence in this case. The aggravating circumstances speak for themselves and carry great weight in the mind of any reasonable and rational person. It is clear that the murder that was committed in this case was deliberately and intentionally planned and carried out. When Corey Schirod Smith found the victim standing beside the road after he shot her, he was given the opportunity to display his humanity. Instead, he unequivocally displayed a savage intention to kill. He ignored pleas for help, and the murder was carried out in a torturous fashion. First, he led her to the place of her death; and she no doubt had full knowledge of the fact that she was about to be killed. Then he deprived her of the very breath of life. Even though the fire was lit to dispose of the remains, its real effect was to complete the execution by use of gasoline and fire. There is no mistake about the tremendously evil intent of this defendant.

When the court weighs the aggravating circumstances against the mitigating circumstances in the manner the law requires, there is absolutely no question and can be no question in the mind of any reasonable human being that the aggravating circumstances far outweigh the mitigating circumstances.

*Smith*, 122 So. 3d at 230–31 (quoting Rule 32 court order, Doc. 15-46, which discusses trial court order). Although the trial court speculated about Smith's intent in effectuating the fire, the trial court clearly stated that "the fire was lit to dispose of the remains." Moreover, the Rule 32 court and ACCA were careful not to consider post-mortem circumstances in their analysis. In fact, the Rule 32 court's order, which the ACCA found to be supported by the record, emphasized that the

court had "no way of knowing, of course, whether the victim had completely lost consciousness before she was doused with gasoline and set on fire" and that "only pre-mortem circumstances are taken into account in determining whether a killing is heinous, atrocious, and cruel." *Id*. at 240. It is clear the state courts did not rely on any post-mortem factors when determining the murder was especially heinous, atrocious or cruel.

More importantly, even assuming the trial court misstated facts related to the burning of the body, it is clear from the record, including Smith's confession, that there are numerous other facts to support the state court's HAC finding, such as circumstances demonstrating the psychological torture of the victim. "Depending on the importance of the factual error to the state court's ultimate 'decision,' that decision might still be reasonable 'even if some of the state court's individual factual findings were erroneous – so long as the decision, taken as a whole, doesn't constitute an "unreasonable determination of the facts" and [is not] "based on" any such determination.'" *Pye*, 50 F.4th at 1035 (citing *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring) (quoting 28 U.S.C. § 2254(d)(2)); *see also Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (noting that subsections (e)(1) and (d)(2) are "independent requirements")).

      b.    Psychological Torture

With respect to Smith's argument challenging the ACCA's finding that she was subjected to psychological torture, the Court agrees there is no direct evidence demonstrating that, while they were in the car, the victim overheard Smith and his co-defendants discuss among themselves how they were going to dispose of her body. The facts, however, do demonstrate the victim was present when the co-defendant directed Smith to "finish her off." And, as discussed below, there are numerous other facts demonstrating psychological torture. Consequently, any misstatement by the state courts regarding what the victim may have overheard while inside the car is of little importance. *See Pye*, 50 F.4th at 1035.

As discussed by the ACCA, there are several facts which support a finding of the HAC aggravating circumstance, including those demonstrating psychological torture. The ACCA found that, after Smith kissed and then shot the victim once in the chest and once toward her head, he and a co-defendant dragged her into the bushes and left the area. She clearly was not dead at that point. Upon returning and finding the victim was alive and standing up, Smith and the co-defendants transported her away from possible sources of medical assistance by driving her around in a car for an extended period while she asked to be taken to a hospital. Smith questioned her about what she would say if they took her to the hospital. After the long ride and the return to Bibb Town, a co-defendant directed Smith to "finish her off" and the victim was required to walk to her place of doom. Smith then

placed a trash bag over her head until it appeared she was no longer breathing. Thus, the ACCA's finding that the victim was subjected to psychological torture is reasonable. Taken as a whole, the ACCA's decision, therefore, does not constitute an unreasonable determination of the facts.

This Court presumes the ACCA's findings of fact are correct, 28 U.S.C. § 2254(e)(1), and there is nothing to suggest that the state court's decision regarding the HAC aggravating factor was contrary to or involved an unreasonable application of clearly established federal law or that the decision was based on an unreasonable determination of the facts in light of the evidence presented, 28 U.S.C. § 2254(d).

### 4.  The Weighing of Factors

Smith's final argument is that he is entitled to habeas relief because the ACCA "fail[ed] to properly weigh the totality of the mitigating factors against the aggravating factors."   (Doc. 25 at 76.) He asserts that, when weighing the aggravating factors which "are not entitled to as much weight as they were accorded by the Court of Criminal Appeals . . . against the mitigating mental health evidence which should have been but was not heard by the jury at the sentencing hearing, and which has been ignored and incorrectly discounted by the Court of Criminal Appeals as 'cumulative' and 'largely controverted,' the facts instead show there was a reasonable probability the sentence would have been different had the available mitigation evidence been presented, and the 'heinous, atrocious, and cruel'

aggravating factor had been properly discounted." (Doc. 25 at 83.) This Court has considered and addressed Smith's arguments separately and together.  This Court cannot conclude that the ACCA's determination, that presenting evidence of Smith's mental health and even more evidence of his upbringing would not result in a different outcome at the penalty phase of Smith's capital-murder trial, is contrary to or involved an unreasonable application of *Strickland* or other clearly established federal law or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

## VI.  CONCLUSION

Accordingly, it is

**ORDERED** that Petitioner Corey Shirod Smith's federal habeas corpus petition (Doc. 1) is DENIED without an evidentiary hearing and this case is DISMISSED with prejudice.

Furthermore, a certificate of appealability will not be issued. For a petitioner to obtain a certificate of appealability, he must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing requires that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). And, where a

petition is denied on procedural grounds, he "must show not only that one or more of the claims he has raised presents a substantial constitutional issue, but also that there is a substantial issue about the correctness of the procedural ground on which the petition was denied." *Gordon v. Sec'y, Dep't of Corrs.*, 479 F.3d 1299, 1300 (11th Cir. 2007) (citations omitted). "A 'substantial question' about the procedural ruling means that the correctness of it under the law as it now stands is debatable among jurists of reason." *Id*.

Because reasonable jurists would not find the denial of Petitioner's § 2254 petition debatable, a certificate of appealability is DENIED.

DONE, on this the 12th day of January 2023.

_____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE